# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

PAMELA S. CHRISTIE,　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　**Plaintiff,**　　　)
　　　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　　)　　CASE NO. 13-CV-242-TDD
　　　　　　　　　　　　　　　　　)
STATE FARM MUTUAL　　　　　　　　)
AUTOMOBILE INSURANCE　　　　　　 )
COMPANY,　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　**Defendant.**　　　)

## <u>ORDER</u>

This matter comes before the court on Defendant's Motion for Summary Judgment (Dkt. # 50). Plaintiff filed her response on May 22, 2015 (Dkt. # 61) and the Defendant filed a reply on June 5, 2015 (Dkt. # 64).

Plaintiff filed this action in state court asserting claims under Oklahoma law for breach of contract and breach of the insurer's duty of good faith and fair dealing. These claims arose out of an automobile accident occurring on September 30, 2011, near Tahlequah, Oklahoma, in which Plaintiff's vehicle was struck by a motorist who carried liability insurance with a limit of $250,000. At the time of the accident, Plaintiff and her husband were insured by State Farm under an automobile insurance policy containing uninsured/underinsured motorist ("UM/UIM") coverage with limits of $100,000. Defendant timely removed the case to federal court based on diversity jurisdiction under 28 U.S.C. § 1332(a).

Since it is undisputed that State Farm paid the policy limits of $100,000 to Plaintiff, Defendant argues Plaintiff's claim for breach of contract fails as a matter of law. As to the claim of bad faith, Defendant seeks summary judgment arguing it reasonably investigated and timely

paid the UM/UIM claim. Finally, Defendant argues the punitive damages claim fails as a matter of law since there is no evidence establishing they acted with malice or reckless disregard.

Plaintiff, on the other hand, while not conceding that her claim for breach of contract fails as a matter of law, indicates she is only pursuing her bad faith claim. Plaintiff bases her claim on her expert's opinion which concludes State Farm should have paid her UIM benefits no later than February 28, 2012. Plaintiff asserts State Farm's unreasonable delay of payment is sufficient to submit the bad faith claim to the jury and establishes sufficient evidence to support a reasonable finding that State Farm recklessly disregarded its duty to deal fairly with Plaintiff.

## Undisputed Facts

Plaintiff was involved in a motor vehicle accident with non-party Christina Clinton ("the tortfeasor") on September 30, 2011, near Tahlequah, Oklahoma. The tortfeasor carried liability insurance with a limit of $250,000. Plaintiff's UIM policy issued by State Farm, and in effect at the time of the accident, had limits of $100,000 in UIM coverage, and provided, in pertinent part, as follows:

> **Limits**
>
> * * * * * * * *
> 2. The most **we** will pay will be the lesser of:
>
>> a. The amount by which the insured's damages for bodily injury exceed the amount paid to the insured by or for any person or organization who is or may be held legally liable for the bodily injury; or
>>
>> b. the limits of this coverage.

Dkt. # 50-2, at p. 25. (Emphasis in original)

On October 3, 2011, State Farm received notice of Plaintiff's accident and a claim was filed with the tortfeasor's insurer. Plaintiff made a claim for medical payments under the policy and upon receipt of her medical bills, State Farm paid the medical payment limit of $5,000 on

October 11, 2011. On November 30, 2011, Plaintiff contacted State Farm to inquire about compensation for missed work and expressed her concern that the insurance liability limits of the motorist who struck her vehicle would be insufficient. On December 1, 2011, a State Farm claims representative opened a claims file and performed an initial assignment review of Plaintiff's accident, noting that Plaintiff's total bills at that time were $7,094.88 and the representative estimated her general damages to be $10,000 to $20,000. Additionally, the review indicated there was underlying liability insurance with limits up to $250,000. Further, on the same day, the representative sent Plaintiff a letter explaining, for the first time, her UIM coverage. The letter stated, in part, Plaintiff's UIM "coverage may apply for bodily injuries sustained by an individual when the responsible party is either not insured, or has insufficient liability insurance coverage." Dkt. # 50-4. Additionally, medical authorizations were sent to Plaintiff, and bills and records requests were to be issued to Plaintiff's medical providers upon receipt of the executed authorizations.[1]

On December 2, 2011, State Farm Claim Representative Hali Goss spoke with the Plaintiff and made the following notation in the Claim File Log:

> Call from Pamela – V2D told her at the hospital that she wasn't supposed to be driving because she has seizures. Explained that [tortfeasor's insurer] had accepted 100% liability, so they weren't too concerned about that. Also explained to her that when I spoke with [tortfeasor's insurer] yesterday, I found out that they have a very large liability policy, but that I will continue to monitor closely until she is healed up so I can make sure they do have enough money.

Dkt. #50-1, at p. 65.

---

[1] It appears no medical authorization was sent to Dr. DeLoache, Plaintiff's orthopedist until May 24, 2012, despite Plaintiff having listed Dr. DeLoache as one of her medical providers on December 26, 2011. The document listing Dr. DeLoache as a medical provider indicates his address is 1500 E. Downing, Tahlequah. *See*, Dkt. # 61-6. A letter addressed to "Tahlequah Orthopedic Surgery" at the address provided for Dr. DeLoache is dated May 24, 2012. Dkt. # 50-7, at p. 5. Additionally, no medical authorization was sent to Cherokee Nation EMS until July 9, 2012 even though Plaintiff advised the claims representative on December 1, 2011 they had been utilized. *See*, Dkt. #s 61-3, at pp. 65-66 and 61-10.

3

State Farm received executed authorizations from Plaintiff, as well as verification of her hourly rate from her employer, on December 26, 2011. Three (3) days later, the claims representative spoke with Plaintiff who indicated she was frustrated because she was receiving past due notices from healthcare providers, and the tortfeasor's insurer would not pay her bills until the claim was settled in total. The claims representative explained to Plaintiff that she had exhausted her medical payments coverage and she could contact the healthcare providers to ask them to file liens or do whatever they could to keep the bills out of collections. The representative also requested State Farm processors to obtain Plaintiff's updated medical records, bills, and lost wage documentation.

On February 15, 2012, the claims representative prepared an evaluation of Plaintiff's UIM claim based upon the medical and employee records which had been submitted to State Farm. At that time, Plaintiff's bills totaled $13,841.47 and her lost income was $7,956.48. Plaintiff's general damages were still estimated at $10,000 to $20,000 even though the claims representative was aware, based on Plaintiff's statements, that Dr. Olshen had, on February 9, 2015, diagnosed Plaintiff with PTSD. The total value of Plaintiff's claim was estimated between $31,797.95 and $41,797.95, still well below the $250,000 in available liability insurance from the tortfeasor. Dkt. # 50-1, at pp. 61-62. The claims representative did, however, ask the processor to follow up on various providers' medical bills and/or records.

On February 16, 2012, the claims representative made the first request for bills and records from Dr. Olshen. Additionally, on February 28, 2012, "follow up" requests were sent to Tahlequah City Hospital for medical records, to Dr. Pitman and Dr. Palomino for medical records and bills, and to Keys Family Eye Care. Dkt. # 50-6. On February 29, 2012, State Farm

received the medical records from Dr. Olshen regarding Plaintiff's diagnosis of PTSD and possible post-concussive syndrome.

On April 17, 2012, the claims representative spoke with Plaintiff and made the following notation in the claims file:

> [S]he had knee surgery a week or two ago and doesn't know what to do about the other knee. Her left knee had been swollen for 6 months so they went in last week and did some repair on the patella and injected some medicine. She is off work again. Dr said when he got that knee lined out, he would line out what to do about her right knee. He has recommended she try a series of injections. Treatment is with Dr DeLoache in Tahlequah. She is off work from the MVA again due to the surgery.

Dkt. # 50-1, at p. 10.

On May 17, 2012, the claims representative re-evaluated Plaintiff's claim. At that time, the evaluation had a range of $32,304.95 to $42,304.95. *Id*. Further, on May 24, 2012, the claims representative ordered additional records from Plaintiff's medical providers. Dkt. # 50-7.

Thereafter, on June 1, 2012, the claims representative received additional information from Plaintiff and made the following update to the claim log notes:

> Update from NI – spreadsheets of meds included. She has had one knee surgery but both knees are still really bad, has PTSD that affects her work, spots on the left eye and severe ankle and knee pain constantly. She wants me to look at things and tell her what SF would offer so she knows if [tortfeasor's insurer] is going to get close. Her spreadsheets seemed to build one on the other, and her total charges are $29,013.41. She is claiming 552 hours lost from work as well. Her lost income claim would be up to $9,270.72. At this point, I have $10-20K in general damages, but no documentation of her knee surgery, which would likely increase my general damages. With about $60K in claimed specials, one knee surgery, PTSD for which she is seeking treatment and ongoing lower extremity complaints, I would think general damages may be 50-100K.

Dkt.# 50-1, at p. 12.

On July 6, 2012, the claims representative updated her evaluation of Plaintiff's claims. At that time, the evaluation was in the range of $39,773.69 to $54,773.69; however, the

5

representative did not have all of the bills from the April, 2012 knee surgery. Moreover, the notes of the representative do not reveal that Plaintiff had a fractured femur. As a result, the general damages calculation was only increased to $15,000 to $30,000. *Id*.

On July 9, 2012, State Farm again requested records from Plaintiff's medical providers. This represented the first time that State Farm requested medical bills or records from Cherokee Nation EMS. After receiving additional records, including the bill for Plaintiff's knee surgery, the claims representative updated her evaluation of Plaintiff's claim on August 24, 2012. Based upon this evaluation, Plaintiff's damages were estimated to be between $55,075.69 to $80,075.69, making them still less than the $250,000 in available liability insurance from the tortfeasor. *Id*., at p. 14.

On September 5, 2012, a State Farm team manager reviewed the claim and made the following notation in the claim file:

> Hali, we are a long way from the $250K liability limit. Is it realistic there is an exposure. If not, ***we may not*** need ***to exhaustively investigate a claim we don't anticipate making a payment on.*** Continue your investigation/evaluationNext (sic) cal 180 days.

*Id*., at p. 16 (emphasis added).

State Farm received a letter from Plaintiff's counsel on September 21, 2012 which included medical bills, records, photographs, and a summary of Plaintiff's injuries. The letter demanded payment of the UIM policy limits. Plaintiff's counsel was advised on October 3, 2012 that Plaintiff's medical payment limits were exhausted. Additionally, on October 9, 2012, State Farm received notice the tortfeasor's insurer tendered the $250,000 policy limits on August 28, 2012. Thereafter, on October 18, 2012, Plaintiff's counsel was advised by the claims representative that the evaluation of Plaintiff's claim would be completed the following week.

On October 26, 2012, State Farm waived its subrogation rights by letter of the same date and requested, for the first time, a recorded statement from Plaintiff. The claims representative also completed another evaluation of Plaintiff's claim which noted a range of $91,872.31 to $141,872.

On November 28, 2012, Plaintiff's recorded statement was taken in which Plaintiff stated she was in the process of scheduling a total knee replacement surgery for her left knee and that she had been seeing a psychological counselor. The claim file has notations indicating the Plaintiff was going to need further surgery and attorney would provide information regarding the psychological counselor and orthopedic surgeon Plaintiff was seeing.

On December 14, 2012, State Farm's claim representative updated her evaluation of Plaintiff's loss. At that time, the claims file indicated the estimated claims value was $141,872.31 to $191,872.31. Additionally, the file noted that the claims representative was awaiting information from Plaintiff's counsel including the estimated cost of total knee replacement and information regarding the counselor Plaintiff was seeing. Dkt. # 50-1, at pp. 20-21.

On December 28, 2012, State Farm received additional medical records including a report from Dr. Browne indicating the doctor was recommending total knee replacement of Plaintiff's left knee. *Id*., at p. 21. This report stated that arthroscopic pictures showed Plaintiff had "degenerative changes with complete loss of cartilage retropatellar and changes medially with grade 4 changes over the femoral condyles well." Dkt. # 50-12, at p. 2. The section detailing the doctor's "Impression" stated: "Endstage arthritis of the left knee with complete loss of cartilage in the medial compartment and retropatellar." *Id.* Further, the claims

7

representative contacted Plaintiff's attorney again requesting a surgical estimate for a total knee replacement. Dkt. # 50-1, at p. 21.

On January 3, 2013, Plaintiff's counsel sent prior medical records from Plaintiff's primary care physician at Fort Gibson Medical Center to the claims representative. Additionally, counsel advised State Farm that a request for a surgical estimate had been made and would be forthcoming upon receipt of the same. Dkt. # 50-13.

The claims file indicates, on January 23, 2013, Plaintiff was still obtaining medical treatment and the claims representative was still waiting on the estimated cost of Plaintiff's knee replacement surgery. Despite having a medical authorizations dated December 26, 2011 and October 2, 2012, the claims representative faxed another authorization to Plaintiff's counsel. Dkt. # 50-1, at p. 22. It took approximately six weeks to obtain the new authorization. Dkt. # 61-1, at pp. 45-46.

The claim log file for February 12, 2013, contains the following notations:

- Atty will get me info -
  Still treating (ortho – Dr Kem at EOOC; psych – Melissa Rattery) – she is getting me updated Auth so I can f/u
   Total knee replacement (written opinion, estimate) – she is working on this with ortho

Dkt. # 50-1, at p. 23.

On February 28, 2013, the claims representative followed up with a letter to Plaintiff's counsel which stated, in part:

> Please provide me with an updated Authorization so I can follow up on the additional treatment your client has had. As discussed with your office in November, please also provide me the contact information for Dr Kern and Melissa Rafferty so that I can follow up on documents I need from them.
>
> In December, I also requested an estimate of charges, included (sic) post-operative recovery charges, for the total knee replacement that had been recommended.

> As a reminder, when asserting the Underinsured Motorist Claim, our insured has a contractual duty under the policy to provide the written authorization which authorizes State Farm to gather the necessary medical bills and records to evaluate his (sic) claim.

Dkt. # 50-14.

On March 1, 2013, a State Farm team manager reviewed the evaluation and expressed the following concern:

> I also note knee replacment (sic) due to end stage arthritis. Obvsiouly (sic) a 9/30/11 loss did not result in end stage arthritis. So, we seem to have a signicant causation question there that needs to be addressed, if that is where the value of this claim is coming from. What are we doing to address that?

Dkt. # 50-1, at p. 24.[2] After discussing the claim with the claims representative, the team manager noted, in part, the following on March 5, 2013:

> . . . . .working to get an updated MA (the one we have is 1+ year old) so we can seek clarifciation (sic) on the potential knee replacment (sic) surgery. The ongoing phychological (sic) tx. also nees (sic) further investigation. . . . .
>
> With $41k in specials (which [claims representative] tells me is current), we don't have a claims greater than $250k at this point. If a knee replacment (sic) is attiubtable (sic) to this loss, then we may get there.
>
> [Claims representative] says we have two years of PCP records. That may not be a big enough window to capture her pre-loss health on the knee.
>
> We will follow up on the updated MA and seek the addtional (sic) informtion (sic) we need.

*Id*.

On March 6, 2013, the claims representative received a telephone call from Plaintiff's counsel and summarized the same in the claim file as follows:

> Call from Atty Ty Smith – they have been trying to get the cost estimates which he doesn't know why we need because we adjust thousands of TKRs a year for this but they are jumping through all kinds of hoops for us. It should go out along

---

[2] Despite this notation, no mention was made of this concern to Plaintiff's counsel nor was any inquiry made of Plaintiff's treating physicians for more than a month.

> with the Auth. He called because [the plaintiff] called him yesterday and she is having all kinds of problems with her knee and wants to get the claim settled asap so she can have the surgery.
>
> He wanted to know what questions I have for the dr – told him that without the auth, I hadn't written the Ltr yet. He said she was getting impatient. Reminded him I had sent the Auth in Jan, and without it, and the other items they said they would get me, the claim had not progressed.

*Id*., at pp. 24 and 25. The next day, State Farm received Plaintiff's conditional medical authorization and the estimated cost of her total knee replacement surgery. *Id*., at p. 25. On March 15, 2013, State Farm requested a narrative from Dr. Browne and records from Plaintiff's treating psychological counselor, Melissa Ratteree-Rape. *Id.*, at p. 26. *See also*, Dkt. # 50-13.

On March 28, 2013, Plaintiff's counsel made inquiry by letter regarding why State Farm had not yet tendered the policy limits to Plaintiff. At that time, counsel advised State Farm if they did "not offer its limits of all applicable UM coverage by April 10, 2013, we will file suit." Dkt. # 50-16. Additionally, the letter advised State Farm that, in counsel's opinion, State Farm has had all of the information required to pay the claim for many months. *Id*. On April 8, 2013, the claims representative responded by writing a letter detailing the numerous requests for information she had made to Plaintiff's counsel and concluded by stating her evaluation of the claim, at that time, was less than the amount of money offered by the tortfeasor's insurer. Dkt. # 50-17. Additionally, on the same day the claims representative sent a letter advising Plaintiff's counsel of her concerns regarding 1) causation as it related to the left knee and indicating she had requested a narrative report from Dr. Browne; and 2) Plaintiff's claim for cognitive/psychological injury thereby necessitating a request for full records from Dr. Ratterree-Rape. Dkt. # 50-18. This letter is the first time State Farm advised Plaintiff's counsel that it had questions relating to causation. Moreover, there is no note in the claim file indicating what questions State Farm had in relation to Plaintiff's cognitive/psychological injury.

On April 15, 2013, State Farm received the records from Dr. Ratterree-Rape (Plaintiff's counselor). Dkt. # 50-1, at p. 27. On April 16, 2013, State Farm resubmitted their request for a narrative with payment to Dr. Browne. Dkt. # 50-19. During April and May of 2013, State Farm continued its attempts to obtain Dr. Browne's narrative report.

On June 20, 2013, since State Farm had still not received Dr. Browne's narrative report, State Farm requested a limited authorization for obtaining the report in an attempt to "complete their evaluation" of Plaintiff's claim. Dkt. # 50-20. Thereafter, on June 20, 2013, State Farm received the narrative report from Dr. Browne. This report included Dr. Browne's recommendation for a total knee replacement of the left knee and stated, in part:

> I have reviewed medical records from Dr. Kern along with a MRI that was done following her motor vehicle accident. It would appear at that time the MRI showed fairly minor changes in the joint. Since that MRI until her second MRI in 2012 and my examination in late 2012, she has had a rapid destruction of the joint. While I cannot say the definitive cause of her problem is due to her motor vehicle accident, I also would not expect such a rapid deterioration on the norm. Therefore, I feel the problems in her left knee are related to or were advanced/sped up secondary to her motor vehicle accident.

Dkt. # 50-21.

On July 16, 2013, State Farm offered the policy limits of $100,000. The proceeds were issued on August 1, 2013. Dkt. #s 50-22 & 50-23.

## Legal Analysis

Summary judgment is appropriate where there is no dispute of material facts and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.56. When presented with a summary judgment motion, this Court must determine whether there "are any genuine factual issues that properly can be resolved only by the finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). When evaluating a motion for summary judgment, this

Court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988). The party opposing summary judgment, however, "may not rest upon mere allegations or denials of his pleading but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

In Oklahoma, UM/UIM insurance is intended to cover the amount of injury or damage which exceeds the liability limits of the tortfeasor. *Buzzard v. Farmers Ins. Co., Inc.,* 824 P.2d 1105, 1112 (Okla. 1991). However, "exhaustion of limits is not required as a condition precedent to recovery." *Id.* An insurer is required to conduct a prompt investigation and evaluation of the UM/UIM claim, and prompt payment must be offered as soon as it is determined that the likely worth of the claim exceeds the liability limits. *Id*.

Under Oklahoma law, the esssence of an action for breach of the duty of good faith and fair dealing "is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy, and if there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case." *McCorkle v. Great Atlantic Ins. Co.,* 637 P.2d 583, 587 (Okla. 1981). Additionally, Oklahoma law requires an insurer to advise an insured who is making a claim about pertinent coverages that might apply under the policy and assist the insured in making the claim. *See*, OKLA. STAT. tit. 36, § 1250.5(1).

State Farm does not dispute that a reasonable, prompt investigation and evaluation of an underinsured motorist claim is required. However, they assert mere delays are not enough to establish bad faith and the Plaintiff must establish there was no "legitimate dispute." *Thompson v. Shelter Mut. Ins. Co.*, 875 F.2d 1460, 1462 (10th Cir. 1989). While UM/UIM coverage requires the insurer to pay only if the insured's damages exceed the liability limits of the responsible tortfeasor, the insurer still has a duty to investigate the claim and keep up to date on the valuation of the claim sufficient to perform its contractual duties should they arise. As soon as a determination is made "that the likely worth of the claim exceeds the liability limits, prompt payment must be offered." *Buzzard,* 824 P.2d at 1112.

Applying these standards here, the Court finds that geniune issues of material facts preclude summary judgment on Plaintiff's bad faith claim. Plaintiff presents facts and evidence to show that State Farm was notified of Plaintiff's accident and her significant injuries on October 3, 2011, just a few days after the accident occurred. While State Farm chose to immediately file a liability claim with the tortfeasor's insurance company and promptly pay the limits of Plaintiff's medical payments coverage, it did not promptly advise Plaintiff that she had UM/UIM coverage or that it might apply to her loss, despite the fact it was obligated, under Oklahoma law, to do so. No investigation was even done on Plaintiff's claim, nor was a file of any kind opened, until December 1, 2011, almost two months after State Farm first learned of the accident. Once a UM/UIM claim was finally opened, however, the facts support a reasonable inference that State Farm did not conduct a timely, meaningful investigation. Specifically, they did not take the statement of the Plaintiff until November 28, 2012, they conducted no investigation into pre-existing injuries, nor did they make effective attempts to gather records of pertinent medical providers. For instance, no request for medical records was

made to Plaintiff's orthopedist, Dr. DeLoache, until May 24, 2012 even though Plaintiff listed this doctor as a medical provider as early as December 26, 2011. Additionally, although a claims representative was advised on December 1, 2011, that Cherokee Nation EMS had transported Plaintiff to the hospital, no medical authorization was sent to them until July 9, 2012. Furthermore, despite having apparently valid medical authorizations in its possession, State Farm continually requested new medical authorizations be submitted, and it continually requested Plaintiff's counsel provide a narrative report from Dr. Browne instead of simply requesting it directly from Dr. Browne. State Farm also repeatedly requested Plaintiff's counsel provide an estimate of the cost of knee replacement surgery, even though it arguably should have been able to arrive at a reasonable estimate of such cost on its own. And, State Farm waited nearly one year after being advised that Plaintiff was being treated for PTSD to finally ask for those treatment records. Finally, approximately eight months elapsed between when the tortfeasor's insurer tendered its policy limits and when State Farm acknowledged that Plaintiff's UM/UIM coverage was triggered. Viewing these facts in the light most favorable to Plaintiff, a reasonable jury could find that Defendant did not undertake a timely and appropriate investigation, and did not notify Plaintiff of pertinent coverages which might apply under her policy or assist her in making her claim. Therefore, Defendant is not entitled to summary judgment on Plaintiff's bad faith claim.

Similarly, the Court finds that Plaintiff has demonstrated genuine issues of material facts regarding whether Defendant's conduct may warrant an award of punitive damages. In order to obtain punitive damages, a plaintiff must demonstrate by clear and convincing evidence that: "[a]n insurer has recklessly disregarded its duty to deal fairly and in good faith with its insured. . . ." or "[a]n insurer has intentionally and with malice breached its duty to deal fairly and act in

good faith with its insured." OKLA. STAT., tit. 23, §§ 9.1(B)(2) and (C)(2). Put another way, "there must be evidence, at a minimum, of reckless disregard toward another's rights from which malice and evil intent may be inferred." *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1106 (Okla. 2005). The record herein contains minimally sufficient facts and evidence that, viewed most favorably to Plaintiff, could support a reasonable finding that Defendant recklessly disregarded Plaintiff's rights to fair treatment, reasonable investigation, and timely payment on her UM/UIM claim. Therefore, Defendant is not entitled to summary judgment on the issue of punitive damages.

## Conclusion

For the reasons stated herein, this Court **denies** the Defendants' Motion for Summary Judgment (Dkt. # 50).

IT IS SO ORDERED this 11th day of August, 2015.

_____
TIMOTHY D. DEGIUSTI
UNITED STATES DISTRICT JUDGE